Booker T. Wade Jr., In Pro Per
605 Forest Avenue
Palo Alto, CA 94301
415 378 6250
bookertwade@hotmail.com

FILED

JUN 0 6 2013

CLERK
UNITED STATES BANKRUPTCY COURT
SAN JOSE, CALIFORNIA

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| In re: | Case No. 013-50376 SLJ |
| Booker T. Wade Jr., | Chapter 11 |
|                   Debtor. | **MOTION TO REJECT EXECUTORY CONTRACT** |

Date:       August 21, 2013
Time:       2:00 p. m.
Courtroom: 3099, 3rd Floor
                   Hon. Stephen L. Johnson

## INTRODUCTION

Booker T. Wade Jr., Debtor and Debtor in Possession (Debtor), pursuant to 11 U.S.C. § 365(a) and Fed. R. Bankr. P. 6006, requests the Court's approval to reject a certain executory contract between Debtor and Arlene Stevens (Stevens). Specifically, the Debtor seeks approval to reject the property settlement agreement between Debtor and Stevens as reflected in the conversations of Debtor, Stevens, their counsel as stated on the record in a 117-page reporter's transcript of negotiations before former Presiding Judge Jamie Jacobs-May of the Santa Clara County Superior Court on January 21 and 22, 2009. (Settlement Agreement or Reporter's Transcript). A copy of the Settlement Agreement is attached hereto as Exhibit No. 1.

Case: 13-50376    Doc# 52    Filed: 06/06/13    Entered: 06/07/13 13:20:45    Page 1 of 30

## JURSIDICTION

2. Debtor filed a voluntary Chapter 11 petition on January 22, 2013. Debtor continues to operate as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 157(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a). This is a core proceeding pursuant to 11 U.S.C. Section 157(b)(2)(O).

## FACTUAL BACKGROUND

### Business & Domestic Relationships

3. Prior to February 2007, Debtor and unsecured creditor Stevens maintained a 20-year non–marital business and personal relationship. Upon the breakdown of the relationship, disputes arose as to ownership interests in multiple assets acquired by Debtor and Stevens during their relationship, including residences in Palo Alto, Woodside and Tucson, Arizona; a commercial office building in Palo Alto; licensees issued by the Federal Communications Commission [FCC] for a new FM radio broadcast station at Clarksdale, Mississippi, a new broadcast television station at Topeka, Kansas, cellular telephone licenses for College Station, Texas and Portland, Oregon; and intellectual property rights to certain television programs known as "Wedding Television."

4. The various claims and counterclaims resulted in state court litigation in a case entitled Arlene Stevens v. Booker T. Wade, Jr., et al, Santa Clara County Superior Court Case No.: 1-07-CV-090284). These claims ostensibly were resolved following two days of on-the-record conversations and negotiations before then Presiding Judge Jaime Jacobs-May ending on January 23, 2009, as a "Settlement Agreement." The terms of the agreement were scattered among discussions and negotiations, often inconsistent, throughout a 117-page transcript between seven people – the Judge, Debtor, Stevens and counsel and co-counsel for Debtor and Stevens. A copy of the reporter's transcript is shown at Exhibit 1. Under the terms of the negotiations, the Settlement Agreement was required to be reduced to writing by counsel for Stevens[1]. However, no writing was produced, resulting in years of arbitration and litigation in multiple forums as to its validity, scope, duties, performances and claims of fraud in the formation. With the filing of the petition, this litigation has been stayed.

---

[1] Reporter's Transcript, at 71:16-14; 19-24; 72"1-14; and 115:1-13.

Case: 13-50376    Doc# 52    Filed: 06/06/13    Entered: 06/07/13 13:20:45    Page 2 of 30

**Non-Performed Duties**

5. The Settlement Agreement created numerous continuing obligations of Debtor and of Stevens. These continuing mutual obligations include, without limitation, coordination to produce legal documents/instruments; protection of assets; marketing and sale of real and personal properties; searches for disputed and/or unidentified assets; the search, identification of more than 3000 video tapes and thereafter the segregation, editing and transfer of intellectual content from some of the tapes to digital formats - and doing all of these in good faith. As reflected in the itemization below, most of these foregoing obligations remain non-performed.

**Non-Performances By Stevens**

6. The Settlement Agreement required performances by Stevens that remain non-performed. Stevens was required to, but has not (and now cannot), complete or undertake performance as to the following:

- Reduce the on-the-record discussions to a formal and complete proposed written settlement agreement for consideration by Debtor.[2] As of the date of the petition, Stevens had failed to do so. Post-petition, on January 25, 2013, Stevens hurriedly served Debtor with a proposed one and half page agreement which does not include all the provisions of the 117 page on-the-record terms, conditions and factors;[3]

- Market, sell and share with Debtor the proceeds of a license issued by the Federal Communications Commission (FCC) for a new wireless cellular telephone entity serving Portland, Oregon.[4] Stevens has failed to do so. Instead, she allowed the license to expire without causing the facility to be constructed timely as required by the FCC. As of the date of the petition, Stevens has not provided any required alternative performance of this obligation;

- Cooperate with Debtor in securing a release of her personal liability under promissory notes with Sonoma National Bank and the U.S. Small Business Administration as to a commercial office building at 1010 Corporation Way, Palo Alto.[5] Instead, exercising her banking privacy rights, Stevens on February 17, 2009, directed the bank not to cooperate with Debtor to secure her release. The bank and agency honored her request; and

- Accept delivery from Debtor of approximately 325 video tapes and computer digital

---

[2] See Note 1.
[3] See Exhibit 2, attached hereto.
[4] Reporter's Transcript, at 19:19-23; 34:16-20.
[5] Reporter's Transcript, at 16:8-15.

Case: 13-50376    Doc# 52    Filed: 06/06/13    Entered: 06/07/13 13:20:45    Page 3 of 30

instruments containing hundreds of hours of content of "Wedding Television," television programming shows concerning all things about weddings.[6] Stevens declined to accept delivery, maintaining that Debtor had failed to search, discover and provide adequate assurances that Debtor's efforts have been in good faith. To date, three years after tender of the content, Stevens has not accepted delivery and the content remains in the possession of Debtor's employer's counsel.

Non-Performance By Debtor

7. Debtor was required by the Settlement Agreement to perform the following items but has not so performed as follows:

- As to Wedding Television, meet with and provide Stevens with, all video content, files, periodicals, books, photographs and depictions of all kinds under Debtor's control or possession or under the control or possession of Debtor's employer.[7] In December 2012, Stevens advised counsel for Debtor's employer that Debtor had not performed all of Debtor's obligations to provide all content and intellectual property and Stevens thereby declined to meet and confer or accept delivery of the tendered content;

- Cooperate with Stevens in the marketing and sale of Debtor's principal condominium residence in Palo Alto;[8]

- Meet and confer with Stevens as to the division of personal effects and furnishings;[9]

- Debtor has failed to perform a requirement[10] to cause Debtor's niece and nephew (and their successors) as shareholders of Cooper Fowler Media Company, holder of a FCC license for KSQA, Channel 12, Topeka, Kansas, to market and sell the license and provide Stevens with a share of the sale proceeds.

Other Non-Performances

8. To the event of any of specified potential implementation disputes developed, the Settlement Agreement designated a JAMS arbitrator to resolve any such disputes.[11] As of January 14, 2011, the arbitrator had resolved some but not all disputes. The arbitrator on that date withdrew from the proceeding, leaving disputed unresolved issues. The Settlement Agreement provided that if the arbitrator was unavailable, Judge Jacobs-May personally would designate a

---

[6] Reporter's Transcript, at 33 through 49; 50:14-21.
[7] Reporter's Transcript, at Note 6.
[8] Reporter's Transcript, at 5:19-22.
[9] Reporter's Transcript, at 110:22-27.
[10] Reporter's Transcript, at 19:19-23; 34:16-20.
[11] See, e.g., Reporter's Transcript, at 15:24-28; 16:1-2; 19:23-28; 30:16-21; 44 to 49;50:14-21; 55 to 56.

Case: 13-50376     Doc# 52     Filed: 06/06/13     Entered: 06/07/13 13:20:45     Page 4 of 30

successor.[12]

9. Given (a) that Judge Jacobs-May retained personal jurisdiction over the Settlement Agreement and has disqualified herself because of a conflict of interest (b) the arbitrator has withdrawn and is disqualified by virtue of Judge Jacobs-May's disqualification and (c) the status and former status of James Towery, Debtor's former counsel as to the Settlement Agreement *and* creditor's Hoge Fenton Jones & Appel Inc.'s former managing litigation partner and Towery's <u>current</u> association with Stevens' as counsel to Stevens' current counsel *and* Towery's pending nomination to a seat on the Santa Clara Superior Court – Debtor submits that the multiple conflicts *and* disqualifications render resolution of Settlement Agreement disputes non-resolvable, at least not without additional years of further litigation in multiple forums. As such, substantial non-performed duties of Stevens and Debtor existed as of the petition date.

Stevens' Motion to Enforce Settlement

10. On January 25, 2013, Stevens post-petition filed in the Santa Clara County Superior Court a pleading captioned "<u>Notice of Motion and Motion for Enforcement of Settlement Agreement (CCP Section 664.6)</u>." Therein, Stevens sought orders from the state court directing Debtor to perform non-performed functions, including the following:

- Acceptance of a Stevens proposed 4 page formal written Settlement Agreement;
- Acceptance and Execution of a Stevens proposed promissory note;
- Damages from Debtor for the failure to deliver content for Wedding Television; and
- Damages from Debtor of $300,000 for certain broadcast equipment in consideration of the transfer to Debtor of the equipment, even though Stevens has declined to transfer, and has not transferred, her interests in the equipment to Debtor;

11. Debtor contends that in filing the enforcement motion and in seeking specific performance of the items detailed above, Stevens of necessity acknowledges that the Settlement Agreement is an executory contract.

**RIGHT TO REJECT** SETTLEMENT AGREEMENT

12. Section 365(a) of the Bankruptcy Code states in pertinent part that:

> . . .the trustee[13] subject to the court's approval may assume or reject any executory contract or unexpired lease of the debtor."

"The Bankruptcy Code does not explicitly define the term 'executory contract.' The legislative

---

[12] Reporter's Transcript, 80:21-28.
[13] As a debtor-in-possession, Debtor has all the rights of a trustee under. *See* 11 U.S.C. Section 1107(a).

Case: 13-50376    Doc# 52    Filed: 06/06/13    Entered: 06/07/13 13:20:45    Page 5 of 30

history, however, indicated that Congress intended the terms to be defined as a contract 'on which performance remains due to some extent on both sides'." In re Pro Page Partners, LLC, 270 B.R. 221, 226, 227 (Bankr. E.D. Tenn. 2001) (quoting Terrell v. Albaugh (In re Terrell), 892 F. 2d 469, 471 (6th Cir. 1989) (quoting S. Rep. No. 95-989, a 58 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5844)).

13. Congress apparently had in mind the definition of executory contracts set forth in Countryman, Executory Contracts in Bankruptcy: Part 1, 57, Minn. L. Rev. 439, 460 (1973). Professor Countryman defined an executory contract for the purposes of the *Bankruptcy Code* as 'a contract under which the obligation of both the bankrupt and the other party are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.' Pro Page Partners, at 227, *citing* In re Terrell, 892 F.2d at 471, n. 2.

14. Debtor contends that the Settlement Agreement is an executory contract under Terrell and/or under the Countryman definition in that the agreement contains numerous provisions that, if remain unperformed or if either party fails to complete performance, would constitute a material breach. These provisions include, without limitation, those referenced in Paragraphs 5 through 9, above. Further, although not the common contract or unexpired lease, property settlement agreements generally are within the ambit of Section 365(a). *In re Columbia Gas Systems Inc.*, 50 F.3d 233 (3rd Cir. 1995). And, domestic property settlements are also with the statute, so long as the settlement agreement does not involve child support or spousal support.[14] *Draper v Draper*, 790 F.2 52, 54 (8th Cir. 1986).

15. The decision as to whether to reject an executory contract is left to the sound business[15] judgment of the debtor. *Lubigol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046-47 (4th Cir. 1985); *Phar-Mor, Inc. v. Strauss Building Associates*, 204 B.R. 948, 954 (Bankr. N.D. Ohio, 1977); *In re Level Propane Gases, Inc.*, 2007 WL 1821723 (N.D. Ohio, June 22, 2007).

16. Under the business judgment rule, the Court should "presume that the debtor acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate.*" In re Pomona Valley Med. Group*, 476 F.3d 665, 670

---

[14] Debtor and Stevens were never married nor have children.
[15] Precedents refer to "business" judgment as the Chapter 11 appellate cases cited involved businesses. There is no reason to believe that individuals in Chapter 11 are not afforded the same test of sound judgment.

Case: 13-50376    Doc# 52    Filed: 06/06/13    Entered: 06/07/13 13:20:45    Page 6 of 30

(9th Cir. 2007) (citations omitted). The Court should approve the requested rejection unless the decision is so manifestly unreasonable that it could not be based on sound judgment, but only on bad faith, or whim or caprice. *Id.* (citations omitted).

17. Herein, the requested rejection is in the sound judgment of the Debtor and in the best interests of the estate, particularly the unsecured creditors. See *In re Orion Pictures Corp.*, 4 F.3d 1095, 1098 (2d Cir. 1998) [rejection should benefit unsecured creditors]. Rejection of the Settlement Agreement could relive the estate of a significant creditor's claim of Stevens. Importantly, it would presumptively make available to Debtor for use by the estate, fifty percent of the proceeds or about $325,000 currently held in escrow by counsel for Stevens. Also, rejection would not harm Stevens' claim as her status as an unsecured creditor would be retained. It is, therefore, in the best interests of the estate to reject the Settlement Agreement.

18. The continued association or adherence to the Settlement Agreement is no longer of benefit to Debtor or the estate. In fact, the Settlement Agreement harms and hinders Debtor growth and financial viability, thereby hindering and harming Debtor's capacity to protect creditors of the estate. From the date of the signing of the Settlement Agreement, Debtor's financial position has steadily declined in size, scope, stature and capacity. Debtor's interests in jointly owned assets and Debtor's non-compensation for business and professional services provided to secure the disputed assets that were and are subject to the Settlement Agreement, have declined from millions of dollars in values in 2007 in FCC licenses for new radio stations, television stations and wireless licenses and real property to a negative value as of the date of the petition. Further, Debtor is hampered and is fearful of creating new intellectual property in television programming concerning weddings, as Debtor is deterred as to whether such creations would violate the Settlement Agreement, given that Stevens maintains that Debtor still possesses and controls personal and intellectual property to which Stevens is entitled.[16]

## CONCLUSION

In view of the foregoing, Debtor requests the Court to grant Debtor approval and permit Debtor to reject the Settlement Agreement as an executory contract.

Dated: June 6, 2013

Booker T. Wade Jr.
Debtor and Debtor-in-Possession

---

[16] Compare, Reporter's Transcript, at 44 to 49.

Case: 13-50376    Doc# 52    Filed: 06/06/13    Entered: 06/07/13 13:20:45    Page 7 of 30

1

2          **Exhibit 1**

3      **Reporter's Transcript of Settlement Agreement**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

BEFORE THE HONORABLE JAMIE JACOBS-MAY, JUDGE

DEPARTMENT NO. 4

---oOo---

ARLENE STEVENS, SUNGILT )
CORPORATION and TV-32 DIGITAL )
VENTURES, INC., )
)
Plaintiffs, )
)
vs. )            Case No. 1-07-CV-090284
)
COOPER-FOWLER MEDIA COMPANY, )
MINORITY TELEVISION PROJECT, )
INC., GREG TALLEY, SHEILA )
ROBERTSON TALLEY and BOOKER T. )
WADE, JR., )
)
Defendants. )
_____)
)
AND RELATED CROSS-ACTION. )
_____)

---oOo---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Wednesday, January 21, 2009

VOLUME I of II – Pages 1 - 67

---oOo---

A-P-P-E-A-R-A-N-C-E-S:

FOR THE PLAINTIFFS:

DAVID M. HAMERSLOUGH and
STEPHEN S. FRY,
Attorneys at Law

FOR THE DEFENDANTS:

JAMES E. TOWERY and
NATASHA M. PARRETT,
Attorneys at Law

OFFICIAL COURT REPORTER:

PATRICK CROWLEY, CSR 11271
RPR, CRR 846186

COPYING PROHIBITED PURSUANT TO GOV CODE 69954(d)

1   San Jose, California

2                           PROCEEDINGS

3           THE COURT:  Okay.  We're on the record in the

4   matter of Stevens versus Wade, 1-07-CV-090284.  There are

5   related matters.  There was a related case in San Mateo, and

6   this case is resolving that because that has to do with a

7   partition of Woodside, right?

8           MR. TOWERY:  They've been coordinated.

9           THE COURT:  Here?

10          MR. TOWERY:  Three actions have been coordinated

11  in this number.

12          THE COURT:  Okay, so the --

13          MR. TOWERY:  And I don't -- I don't have the other

14  case numbers.

15          THE COURT:  Well, there are three actions.  One's

16  this Woodside action and another is a domestic violence

17  action.  And the domestic violence action is both -- is it

18  the restraining order or is it the personal injury for the

19  domestic violence?

20          MR. HAMERSLOUGH:  It's -- all of that is being

21  carved out.

22          THE COURT:  Okay, so the first thing we're going

23  to do is get appearances for Ms. Stevens, first of all.

24          MR. HAMERSLOUGH:  Dave Hamerslough.

25          MR. FRY:  Stephen Fry.

26          THE COURT:  And, Ms. Stevens, I need your name for

27  the record.

28          MS. STEVENS:  Arlene Stevens.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

1          THE COURT:  And for Mr. Wade.

2          MR. TOWERY:  James Towery.

3          MS. PARRETT:  Natasha Parrett.

4          THE COURT:  And?

5          MR. WADE:  Booker Wade.

6          THE COURT:  And we've been at this for about two

7    and a half days.  I'm going to start announcing the terms of

8    the agreement for the record.  If I say anything wrong,

9    interrupt me right away -- don't wait -- so we get it right.

10   If I leave anything out, at the end of this tell me what it

11   is so we can get it on the record.

12          At the end of this record, I'm going to ask the

13   two parties three questions:  Did you understand everything

14   I said; do you have any questions; do you agree to these

15   terms and conditions -- four questions -- and do you want me

16   to make this a court order?  And when I hear yes to all

17   that, it's binding.

18          If at the end of all this there's a dispute about

19   what we agreed to, I get this transcript and this transcript

20   controls.  So, if you end up drafting a written agreement or

21   not, you end up fighting about what did we agree to, I go

22   back to this transcript and this transcript controls.

23          I guess the first thing I want to say is let's

24   just talk about -- there are a number of cases; they're

25   coordinated.  This case is not resolving the domestic

26   violence cases in any respect.  So, my understanding is

27   there may be issues about restraining orders; there may be

28   issues about personal injury involving domestic violence.  I

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

1  think there are claims and cross-claims, meaning each party

2  has asserted claims against the other.  This case is not

3  resolving anything that has to do with domestic violence or

4  personal injury resulting from domestic violence.

5      MR. TOWERY:  Your Honor, the way that I would

6  suggest we phrase that is -- we've been discussing among

7  counsel -- is that the causes of action in the respective

8  second amended complaint, first amended cross-complaint

9  related to intentional torts and/or domestic violence are

10  severed.  And so those causes of action are in this

11  complaint right now, but we're severing them in this

12  complaint -- this settlement leaves those unresolved.

13      THE COURT:  Intentional tort is too broad.  So,

14  there may be causes of action for fraud or deceit or

15  whatever, and we are resolving those.  So, let's just stick

16  to the gravamen, which is domestic violence, which leads to

17  a restraining order.  And what I understand is domestic

18  violence is also known as battery and assault, meaning

19  physical touching that leads to personal injury.  So,

20  anything arising out of notions of this physical touching

21  are carved out.

22      MR. HAMERSLOUGH:  Right.  And, for example, when

23  we were talking today up in Judge Cabrinha's department, we

24  were talking about, you know, the police officers, the

25  police reports, you know, doctors, you know, the medical

26  issues, those sorts of things, Judge.

27      THE COURT:  So, those are not being settled.  So,

28  now we've talked about what's not being settled.  The second

COPYING PROHIBITED PURSUANT TO GOV CODE 29954(d)

1  thing I want to say is the Court -- I mean, strike that.

2  The parties have asked the Court --

3       MR. TOWERY:  That would include -- what's not

4  being resolved is the malicious prosecution.  That was

5  alleged out of all of those incidents in the August of '07,

6  so that is severed and set aside as well.

7       THE COURT:  Okay.  So, if you're talking about

8  malicious prosecution arising from domestic violence claims,

9  that's fine.

10      MR. TOWERY:  That's what's pled, and --

11      THE COURT:  Then that is also not being resolved.

12 So, the things arising out of the domestic violence claims,

13 whether they're claims for a restraining order, claims for

14 personal injury or claims that were brought improperly and

15 are subject to a malicious prosecution case are not being

16 resolved.

17      The parties have asked the Court to retain

18 jurisdiction under CCP Section 664.6, which is the one that

19 says if you have disputes about what this agreement is and

20 you need a Court to help enforce this quickly and by motion

21 only and not by filing a whole new lawsuit, that code

22 section allows me to do that, and that's part of this

23 agreement.  I will do that.

24      The next thing is that -- I'm going to talk about

25 real property next.  There are three pieces of real property

26 that are in dispute with the -- between the parties.  One we

27 call Woodside because it's located in Woodside.  Does

28 somebody have the address?

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

1            MR. HAMERSLOUGH:  Tripp, T-r-i-p-p, Road.

2            MS. STEVENS:  3575.

3            MS. PARRETT:  3575.

4            THE COURT:  3575 Tripp Road.  That's the Woodside

5    address.  One is 1010 Corporate Way in --

6            MS. STEVENS:  Corporation.

7            THE COURT:  Corporation Way in?

8            MS. STEVENS:  Palo Alto.

9            MR. HAMERSLOUGH:  Palo Alto.

10           THE COURT:  And the third is a condo in Palo Alto.

11           MS. STEVENS:  605 Forest Avenue.

12           MR. HAMERSLOUGH:  Forest Avenue.

13           THE COURT:  Okay.  Those are the three pieces of

14   property, real property.  This is what's happening to them.

15   The Wood -- and, number one, the parties represent as true

16   that none of these pieces of property have encumbrances,

17   leases or options other than those disclosed in discovery.

18   Is that a good way of saying it?  In other words, they all

19   are encumbered.  One at least has a lease, but I assume --

20           MR. HAMERSLOUGH:  Well, my understanding is that

21   Woodside has a loan with Washington Mutual.

22           MR. FRY:  That's correct.  I mean, we could break

23   it down individually by property.

24           THE COURT:  Do you want to just state what it is

25   then?  So, Woodside has a loan at Washington Mutual put on

26   some time ago, long before this lawsuit was filed, right?

27           MS. STEVENS:  Mm-hm, yes.

28           MS. PARRETT:  Correct.

COPYING PROHIBITED PURSUANT TO COM. CODE 69954(d)

1        THE COURT:  And that's the only loan on it, and

2   that's the representation being made; is that accurate,

3   Mr. Wade?

4        MR. WADE:  It is.

5        THE COURT:  Okay.  The Palo Alto condo --

6        MR. WADE:  In connection with the bailout, it may

7   not be actually Washington Mutual.  But originally --

8        MR. FRY:  Right.

9        MR. WADE:  -- it was Washington Mutual.

10       THE COURT:  In other words, Washington Mutual may

11  have morphed having to do with another company, but it's the

12  same loan.

13       MR. WADE:  It's originated there, yes.

14       THE COURT:  You haven't done anything more.

15       MR. WADE:  That is correct.

16       THE COURT:  Okay.  The Palo Alto condo has a loan

17  from where?

18       MR. WADE:  Chase Manhattan.

19       THE COURT:  And --

20       MR. HAMERSLOUGH:  Is it just a first?

21       MR. WADE:  Only a first.

22       MR. FRY:  So, the second was paid off during one

23  of the refinances?

24       MR. WADE:  At acquisition.  There was a first and

25  a second.

26       MR. FRY:  Correct.

27       MR. WADE:  Both with the same company.  First

28  refinance was consolidated into a first.

Case: 13-50376   Doc# 92   Filed: 06/07/13   Entered: 06/07/13 13:20:45   Page 15 of
30
COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

1        MR. FRY:  Okay.

2        MR. WADE:  There's no second.

3        MR. HAMERSLOUGH:  And what is the approximate

4   amount of that encumbrance at this point?

5        MR. WADE:  556, I believe, thousand.

6        MR. FRY:  Okay.

7        THE COURT:  Okay, and then the third piece of

8   property, 1010 Corporation Way, has an encumbrance in the

9   amount -- with what bank, first of all?

10        MR. FRY:  It's got a first with Sonoma National

11   Bank.

12        THE COURT:  Okay, and a second?

13        MR. FRY:  Well, the second is administered through

14   -- is it Colson?

15        MS. STEVENS:  Mm-hm.

16        MR. FRY:  C-o-l-s-o-n.

17        THE COURT:  And the total encumbrance

18   approximately?

19        MR. FRY:  Hold on a second.  First loan I have

20   with Sonoma National Bank is approximately $2,023,750, and

21   the information I have is that the second loan administered

22   through Colson has an approximate principal amount of

23   $1,416,625.

24        THE COURT:  Okay, so since you put those loans on

25   which predated this lawsuit, in fact more has been put on;

26   is that correct?

27        MS. STEVENS:  That's correct.

28        THE COURT:  Is that correct, Mr. Wade?

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

1          MR. WADE:  That's correct.

2          THE COURT:  And my understanding also is that

3     these loans, maybe both of them, were personally guaranteed

4     by Ms. Stevens.  Is that correct, Ms. Stevens?

5          MS. STEVENS:  That's correct.

6          THE COURT:  And you understand that to be true,

7     too; is that correct, Mr. Wade?

8          MR. WADE:  I'm not sure.

9          THE COURT:  Okay, so I'm assuming that it's true.

10          MS. STEVENS:  Okay.

11          THE COURT:  And for purposes of settlement, we're

12     assuming it's true because certain things will follow from

13     that.

14          So, the first thing I want to say is the Woodside

15     property, by virtue of the settlement, will become the sole

16     and exclusive property of Ms. Stevens.

17          The 1010 Corporation Way property will become the

18     sole and exclusive possession of Mr. Wade.

19          And the Palo Alto condo will -- even though -- and

20     this is true no matter how the title now exists -- will be

21     shared by both parties, 60 percent Ms. Stevens, 40 percent

22     Mr. Wade.

23          MR. HAMERSLOUGH:  Your Honor, I just want to make

24     -- ask for one clarification on something.  I just want to

25     make sure that as to all three properties, there are, as you

26     mentioned, no options, no rights of first refusal, there are

27     no leases.

28          MR. FRY:  Any third party commitments or

1 obligations.

2       THE COURT: Well, there are --

3       MR. HAMERSLOUGH: That's exactly -- Mr. Wade has

4 identified something that I'm concerned about.

5       THE COURT: What -- Mr. Wade, what --

6       MR. WADE: I have permitted my neighbor to board

7 horses on the property on 30 days notice.

8       MR. HAMERSLOUGH: So, do you have a written

9 document?

10       MR. WADE: No.

11       MR. HAMERSLOUGH: Or is it oral?

12       MR. TOWERY: It's just oral.

13       MR. HAMERSLOUGH: I just think we need some

14 provision in this that in the event that we have some issue

15 about that, we can come into court and try to deal with it.

16 That's why I'm asking these questions.

17       THE COURT: Okay, and just so that everybody

18 understands how I would handle this because I don't want

19 anybody to be surprised, the way I would handle it if either

20 of you ended up having a problem with a third party because

21 you did something, I would be requiring you to take care of

22 the problem.

23       So, hypothetically, if your neighbor said I'm not

24 moving my horses, and Ms. Stevens to sell the property had

25 to take court action and hire a lawyer or do whatever, I

26 would make sure that you paid for it, Mr. Wade, and vice

27 versa. If Ms. Stevens did something with any property that

28 caused you a problem and you to incur expenses to fix the

COPYING PROHIBITED PURSUANT TO GOV CODE 69954(d)

1  problem she caused, I would make her pay for it.

2  So, the idea is that you're offering up this

3  property with only the encumbrances that we've identified.

4  And if there are any additional problems, each of you are

5  going to be responsible for fixing those problems.  So, I

6  just want everyone to know that that's the agreement we're

7  entering into.

8  MR. TOWERY:  At some point in time I want to talk

9  about how we're going to accomplish what you just said.

10  I know you have other provisions that you need to

11  discuss, but there's an issue that we need to address in the

12  settlement agreement.  The two residences can be handled by

13  deeds, the transfer of property as provided for in the

14  settlement.

15  1010 Corporation Way is more complicated because

16  title to that is held in the name of a corporation,

17  Television-32 Digital Venture.  Therefore, what we believe

18  is appropriate -- it's never been discussed with you or with

19  counsel.  What we believe is appropriate is that what we're

20  discussing here is a transfer of the corporation to Mr. Wade

21  so that he will be the owner.

22  THE COURT:  Well, you don't need a transfer of the

23  corporation.  You just need the corporation to issue a

24  transfer of the deed.

25  MR. TOWERY:  Well, but we don't think the

26  corporation has any other assets, and --

27  THE COURT:  So --

28  MR. TOWERY:  And there may be problems with the

COPYING PROHIBITED PURSUANT TO GOV CODE 29545

1  lender. That's what I'm saying. To change it from a
2  corporate ownership to a sole ownership, we'd rather leave
3  the corporate ownership and transfer ownership of the
4  corporation. If there's a reason not do that, we'd love to
5  hear that, but we can't think of any. But we would like it
6  to be addressed today before we leave here.

7      THE COURT: Do you want to talk to your client for
8  a second?

9      MR. HAMERSLOUGH: No. I need to discuss the tax
10 ramifications of that with Mr. Thompson. One of the issues
11 we've talked about is that any ongoing expense or obligation
12 including taxes is going to be split, you know, pursuant to
13 a percentage or pursuant to who owns the property.

14      But to the extent that we're now talking about
15 structuring transfers of title, you know, based on corporate
16 ownership or not, there's some tax ramifications. I can try
17 to get Mr. Thompson on the phone. I think -- why don't we
18 get through the rest of this?

19      THE COURT: Okay. Let's -- let's park that and
20 say we need a resolution about how.

21      MR. TOWERY: Am I correct on Woodside? However
22 it's going to happen, it's going to be a quit claim deed
23 from Booker to Arlene? I mean, that's the way to accomplish
24 -- there will be --

25      MR. HAMERSLOUGH: You know what --

26      MR. TOWERY: -- tenants in common right now, so it
27 needs to be changed.

28      MR. HAMERSLOUGH: It does. And the only issue is

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

1 whether that triggers, you know, any potential reassessment

2 or not. We want to cooperate. That's the underlying goal

3 here, and so I think what I would prefer to do is let's talk

4 about what the concepts are, and then let's see -- you know,

5 I will be glad to go back to the office and talk to

6 Mr. Thompson.

7       THE COURT: This is what we can agree on, and this

8 is what I suggest; and hopefully you'll trust me, and I'll

9 tell you how and make a decision. Things don't necessarily

10 have to be transferred by title because if it's going to

11 trigger a reassessment and cause the parties more, cost more

12 money, they're not going to want to do it. But really what

13 we're getting to is a liquidation.

14       So, as I understand it, although I might be wrong,

15 but if the parties want to sell a piece of property, for

16 example, Palo Alto, it may be better not to transfer

17 ownership if transference of ownership would trigger a tax

18 consequence; and instead just do what we're intending to do,

19 which is from the net proceeds -- the net proceeds. So,

20 first you pay off the commission and the pay off the fees

21 and all of that, and what's left over is split 60/40, 40 to

22 Mr. Wade, 60 to Ms. Stevens.

23       Now, if it turns out that there's a liability, it

24 didn't fetch -- it fetched less than what was owed, it would

25 be paid 60/40; 60 Stevens, 40 Wade.

26       MR. TOWERY: Except that we're dealing with two

27 residences, both of which have purchase money mortgages on

28 it. There shouldn't be any deficiency payable by anybody.

COPYING PROHIBITED PURSUANT TO CIVIL CODE 69954(d)

1    THE COURT: Well, and that's a good point, too.

2  But so --

3    MR. HAMERSLOUGH: Not necessarily. Let's not get

4  bogged down in that. I mean, if he refi-ed, that wouldn't

5  be the case.

6    THE COURT: But the point is that -- the point is,

7  is that if there is a dispute about how to do it and ▓▓▓▓

8  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

9  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

10  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

11    But if I have to do it because it's legally

12  required or because someone doesn't want to sell property,

13  they want to keep it as in ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

15  ▓▓▓▓▓▓▓▓▓. But otherwise I'm trying to maximize the amount

16  of money that's left in the parties' pockets, okay?

17    And I think I can do that, for example, with Palo

18  Alto because I think what's underlying this whole settlement

19  is just trying to maximize dollars to the parties as opposed

20  to caring about an interest in property, okay? Do you

21  understand what I'm saying?

22    MS. STEVENS: Yes.

23    THE COURT: Okay. All right, so going through it,

24  the Woodside piece of property is going to be owned by

25  Ms. Stevens. Ms. Stevens, as I understand it, is going to

26  sell it. If she does sell it, all the proceeds go to her.

27  If she doesn't sell it, she's responsible for the ongoing

28  costs.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

1      And then we'll pick a start date in a second for

2 when all this starts. I mean, should we start it February

3 1st? Should we start it today? You tell me when you want

4 to start it.

5      MR. HAMERSLOUGH: I think we ought to start it as

6 of where we are right now.

7      THE COURT: Today?

8      MS. STEVENS: Can we talk about that?

9      THE COURT: So -- all right, so we'll talk for a

10 second. We'll park that for a second. That's Palo Alto

11 we're splitting 60/40 and 1010.

12      My understanding is that it's going to be put up

13 for sale immediately; that beginning today or whatever start

14 date we figure out, Mr. Wade would be fully responsible for

15 the carrying costs, utilities, everything that goes along

16 with ownership.

17      That unlike the Woodside and Palo Alto pieces of

18 property, Ms. Stevens has guaranteed 1010, and she's on the

19 hook for $3.5 plus million. And so the attorneys are going

20 to meet and confer. They're going to try to agree on the

21 details involved in selling, who -- you know, who they

22 should engage to be the listing broker, what should be the

23 purchase price, those kinds of things.

24      If you can't agree, the parties agree to go to

25 Judge Silver, and he'll act as an arbitrator. He may act

26 trying to get the parties to agree; but if you can't agree,

27 he'll just make the call, and you folks will live with the

28 call. And that's true about the two pieces of property that

COPYING PROHIBITED PURSUANT TO GOV CODE 69954(d)

1 have to be sold, which is 1010 and Palo Alto. If you have a

2 dispute, you're going to go to Silver.

3          In terms of -- and both of you are going to be

4 agreeing on the methodology of selling Palo Alto because you

5 own it 60/40 and 1010. Because even though Mr. Wade owns

6 it, Ms. Stevens is on the hook personally if she can't get

7 out of it.

8          If before the time for sale happens, before the

9 time you enter into a contract with someone to buy it, you

10 are able to get Ms. Wade -- Ms. Stevens off the guarantees,

11 then you're free to do whatever you want to with the

12 property. So, that if some -- you were able to convince the

13 lender to release her from the guarantee or able to refi it,

14 your obligations are complete. That's the key for

15 Ms. Stevens is being released of the liability.

16          If when you sell it, you sell it for more than the

17 encumbrance, you get to keep the money. If when you sell

18 it, you sell it for less the encumbrances and there's a

19 deficiency because Ms. Wade is on the hook for that --

20          MR. HAMERSLOUGH: Ms. Stevens.

21          THE COURT: Ms. Stevens is on the hook for it,

22 Mr. Wade is obligated to pay that amount of money. In other

23 words, it's not Ms. Stevens' burden. It's Mr. Wade's burden

24 to pay any deficiency in 1010, just like it's his -- he gets

25 the benefit of ownership, but he also gets the detriment of

26 ownership. So, that's the property.

27          In terms of --

28          MR. HAMERSLOUGH: And may we -- I'm sorry, Your

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

1 Honor.  May we make a point?

2           THE COURT:  Yes.

3           MR. HAMERSLOUGH:  I'm going to use the term

4 security or collateral.

5           THE COURT:  I'm going to do that in a second.

6           MR. HAMERSLOUGH:  I'm sorry.

7           THE COURT:  You have something to say?

8           MR. TOWERY:  Yes.  Although none of us anticipate

9 any deficiency on Woodside because it's a purchase money

10 mortgage, if for any reason there is a deficiency, I assume

11 the mirror image principle would apply.

12           THE COURT:  Meaning -- and that's true about Palo

13 Alto, too.

14           MR. TOWERY:  Yeah.

15           THE COURT:  So, Palo Alto would be 60/40.

16 Woodside would be --

17           MR. TOWERY:  In effect, each party is indemnifying

18 the other if there is any deficiency on the property.  We

19 don't expect there to be any on either the residential

20 properties.  It's only a real risk with respect to 1010, but

21 because we can't foresee everything, if it turns out there

22 is a deficiency on any of the others --

23           THE COURT:  And we have to define what deficiency

24 means.  To me, deficiency does not mean the purchase price

25 of the property was less than the mortgage.

26           MR. TOWERY:  No, not a short sale; you're correct.

27           THE COURT:  Right.  To me, a deficiency means the

28 bank has a right to collect that difference from the parties

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

1  that took out the loan.

2       MR. TOWERY:  The way that I would suggest we

3  phrase it is if either party suffers a financial loss as a

4  result of the sale of the property, then the other party

5  indemnifies them for the full amount of that financial loss,

6  so it's not a short sale.

7       MR. HAMERSLOUGH:  Well, it's clearly not a short

8  sale because that would require, you know, lender approval.

9  I agree that if Ms. Stevens sells Woodside and there is

10 insufficient funds to cover the loans, that she is then

11 responsible for dealing with that aspect financially, as is

12 Mr. Wade.

13      THE COURT:  Actually, I'm saying something not

14 quite that strong.  What I'm saying is if the sale of the

15 property does not cover the loans, Ms. Stevens is still not

16 responsible for anything because it's a purchase money

17 mortgage.  And my understanding --

18      MR. HAMERSLOUGH:  Got it.

19      THE COURT:  Understanding of it is that the lender

20 can only look to the value of the property for their loans.

21      But if for some reason I'm wrong about that or

22 they signed some document or they -- the lender contends

23 somehow that a person is individually responsible,

24 Ms. Stevens would only be responsible for any loss to

25 Mr. Wade if indeed there was a loss.

26      MR. HAMERSLOUGH:  I appreciate the distinction and

27 I accept it.

28      THE COURT:  Okay.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

1          MR. TOWERY:  Yeah.  We accept it, too.  I also

2   want to be heard on the effective date of this

3   responsibility of the real property.  I don't know when --

4          THE COURT:  We're going to -- we haven't talked

5   about it yet.  We'll get there.

6          MR. TOWERY:  Okay.

7          THE COURT:  Now, the next thing is -- the next

8   thing I want to talk about is there's equipment, and the

9   equipment is going to be owned by -- off the record.

10         (Whereupon, a discussion was had off the

11         record.)

12         THE COURT:  All right, on the record.  There's

13  equipment.  Mr. Wade is going to take ownership of the

14  equipment.  Mr. Wade, in exchange for the ownership of the

15  equipment, is going to owe Ms. Stevens $300,000.  Whether

16  it's this note for $300,000 or the obligation under 1010 to

17  get her released from the $3.5 million guarantee, there is

18  other property that is going to secure those obligations.

19         And this other property that's going to secure

20  those obligations is the licenses.  So, the parties agree

21  that the three sell licenses, plus the Topeka license, are

22  going to be sold.  And the parties will again meet and

23  confer regarding the way to sell that property.

24         If they can't agree, that too will go to Judge

25  Silver for decision.  The sale of that property -- and we'll

26  call it the licenses, three sell and the Topeka license,

27  will be shared 70/30, 70 percent to Ms. Stevens, 30 percent

28  to Mr. Wade.

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

1       Nobody -- once that stuff is sold, nobody can

2  collect money until whatever issue they have with respect to

3  the other party is resolved.  For example -- and I'll

4  explain it.  Ms. Stevens has Woodside.  You, Mr. Wade,

5  you've signed a loan on Woodside.  So, Ms. Stevens can't --

6  her 70 percent is going to sit in that account until that

7  debt is over and those issues are resolved.

8       In terms of you, until she is removed from the

9  $3.5 million problem and until your $300,000 note is paid

10  off, your 30 percent interest in this money is going to sit

11  in an account as security for those obligations.  Once the

12  $3.5 million guarantees are removed and once your 300,000

13  note is paid, you can get whatever the remainder is.  But

14  that money will sit there as security to pay for those

15  debts.

16       MR. HAMERSLOUGH:  And can we agree, Your Honor,

17  that we will cooperate and that money will be placed in some

18  interest-bearing account subject to Judge Silver's

19  authorization?

20       THE COURT:  Yes.

21       MR. TOWERY:  This is a material change from

22  anything we've heard before.

23       THE COURT:  No, I -- well, let me --

24       MR. TOWERY:  Because we've heard this applied to

25  the equipment.  We understood and agreed that this principle

26  would apply to the equipment, so that the obligation to

27  repay Ms. Stevens for the equipment was going to be secured

28  by the licenses; therefore, it followed --

COPYING PROHIBITED PURSUANT TO GOV. CODE 69954(d)

1    THE COURT:  If that's true, then it's my apology

2  because I wasn't able to make it clear enough.  It was

3  always the -- it's my fault.  It was always what was

4  intended.  So, do you need a chance to talk?

5    MR. TOWERY:  Well, I mean, let me just surface the

6  issue.  What I would like to do is to build a mechanism into

7  this so that we can come back to you if necessary or Judge

8  Silver -- my preference would be you -- to apply for a

9  modification of this because I can see a circumstance where

10  the licenses are sold.  There's money there.

11    If the money could be released to Mr. Wade, then

12  Mr. Wade could do a work-out with the bank and get

13  Ms. Stevens off the guarantee for the bank loan.  But if

14  Ms. Stevens says you can't have access to the money, then

15  that would frustrate his ability to do a work-out.  And, I

16  mean, it would really -- it would be detrimental in the long

17  run to both parties.

18    THE COURT:  So, why don't we build this in, and

19  then we can figure out if it's me or Silver.  But I agree

20  with what Mr. Towery said, so let me just clarify it and

21  make it crystal clear.  This is important to listen to.  I

22  think it's very, very important for those assets to secure

23  obligations to Ms. Stevens, both the $300,000 loan and the

24  $3.5 million, no question.

25    What Mr. Towery is suggesting, which makes

26  perfectly good sense to me, is you standing before me and

27  say if you can only give me the $200,000, the bank will

28  release her from the $3.5 million.  And I did pay off the

COPYING PROHIBITED PURSUANT TO GOV'T CODE 69954(d)

1    $300,000 note, so, come on, be rational, and I get that.

2         So, if I were convinced or Judge Silver were

3    convinced that a release of money would in fact satisfy your

4    obligations, that's what would happen.  But if the release

5    of the money wouldn't, if it's, well, come on, let me just

6    carry it for two more months and then maybe they will,

7    there's no maybes here.  There's no release of money for

8    maybes.  It's got to actually do the trick.

9         MR. HAMERSLOUGH:  Your Honor, I accept that an

10   application can be made with, you know, supporting evidence

11   in front of either you or Judge Silver, and we would be

12   given the time to, you know, look into it and evaluate it

13   and then --

14        THE COURT:  But you're agreeing now, both of you,

15   to live with whatever decision either me or Judge Silver

16   makes.  That's the point of this, that you're agreeing now.

17   And I'm trying my hardest to anticipate what would come down

18   the pipe and how would I decide it so you're not just you

19   buying into this blind.

20        MR. HAMERSLOUGH:  Right.  As long as, from our

21   perspective, the sale of those other media properties is

22   security or collateral for the payment of the $300,000 with

23   any accrued, you know, interest and principal.  If they want

24   to pay us off out of proceeds, you know, then that's fine

25   with us.

26        We also want that to be security for their

27   obligation to carry the property and security for their

28   retiring us from Corporation Way's underlying loans.

COPYING PROHIBITED PURSUANT TO GOV CODE 69954(d)